[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE FINANCIAL ORDERS
This is an action for dissolution of the marriage of the parties. The principal issues to be addressed in this memorandum of decision are the appropriate financial orders. At trial of this matter, after it became clear that certain custody and visitation issues regarding the parties' minor child, Joshua M. Barry, born on March 4, 1994, were in dispute and there had been no family relations study conducted or attorney for the minor child appointed, the court, at the request of both parties, bifurcated the custody and visitation issues from the remainder of the case.[1] At the conclusion of evidence, the court found jurisdiction in the superior court over this action, made the necessary factual findings, and on August 3, 2001, dissolved the marriage on the grounds of irretrievable breakdown. The court also entered, as requested by the parties, preliminary property orders allocating the motor vehicles listed on each party's financial affidavit to that party. The court retained jurisdiction in the superior court over custody, visitation, and the remaining financial issues.
This court retained personal jurisdiction over the remaining financial issues for purposes of preparing this written memorandum of decision and this memorandum enters final orders on all the financial issues. With regard to custody and visitation, the court is not now entering final orders, and the previously entered pendente lite orders remain in effect, but not as final orders. The court refers the issues of custody and visitation to family relations for mediation and, if necessary, a fonnal study. The court orders the parties to report immediately to family relations for the commencement of mediation. If the parties are unable to resolve these issues by agreement, trial on the custody and visitation issues may be held on them before any judge of the Superior Court.
This case was tried before the court on two days in July and August 2000. The court has carefully considered all of the evidence, including the testimony presented and exhibits entered into evidence, according to the standards required by law.[2] Upon such consideration, the court CT Page 13460 finds that the following facts were proven at trial.
The parties were married on October 14, 1995, in Meriden, Connecticut. They had met several years earlier and had been living together since 1992. After Joshua was born, they moved from their first home in New Haven to Wallingford, where they lived with the plaintiffs mother for about a year, when they moved to their own apartment in Meriden.
In the first years of their marriage, the plaintiff worked in landscaping during summers and indoor painting during the inclement months of winter. He averaged $400 to 450 per week doing that work. The defendant worked as a certified nurse's aid (CNA) in the early years of the marriage, but a back injury five years ago prevents her from doing that work now. While a CNA, she earned between $10 to $13 an hour. After Joshua was born, she stayed at home full-time to care for him until 1997, when she obtained a part-time seasonal job as a school bus driver. During the school year, she earns close to $400 in gross income a week; but while laid off from that work during summers she either collects unemployment benefits, works part-time as a bus driver doing summer camp runs, or a combination of both. The job driving a school bus allowed her to avoid after-school daycare expenses because her employer lets her bring Joshua on the bus with her. During their years living together (both before and during the marriage), the parties' expenses greatly exceeded their income and by the year 2000 they owed more than $40,000 in debt, which they discharged that year in bankruptcy.
In the middle years of their marriage, during 1997 or 1998 both parties testified, they began having troubles in their marriage. The plaintiff smoked marijuana frequently and, despite their mounting debt, spent $25 to $30 a week for his drug habit. The defendant did not approve of the plaintiffs drug use, about which they argued constantly, the defendant unsuccessfully urging him to stop using marijuana. They also argued because the plaintiff wanted to go out in the evening with his friends; he believed that the defendant was overly demanding and possessive because she did not want him to go out without telling her when he would return; and she believed that the plaintiff was neglecting her and paying more attention to his friends than to her. They also argued about their financial problems. On occasion the plaintiff was physically abusive to the defendant during these arguments.[3] Even though the plaintiff made such demeaning statements as telling his wife that she was no longer physically attractive to him, the defendant wanted the marriage to continue so that Joshua could grow up with both parents in the same household and because she needed his financial support.
The landscaping work that the plaintiff did in the early years of the marriage was hard, demanding physical labor, with few prospects for CT Page 13461 long-term financial gain. Seeing their financial situation worsening steadily, in the late 1990s the parties decided to enhance their vocational skills by each going back to school. They agreed that the plaintiff would do so first by attending a technical school to get trained and certified as an auto mechanic; then, they agreed, the defendant would return to school to obtain training as a licensed practical nurse. Each one's course of study would take about a year. With available loans and working together in such an endeavor, they believed, and the court finds, that their plan was feasible.
Pursuant to this plan, Mr. Barry obtained a government loan for $11,500, then enrolled in 1998 in an automobile mechanic program at New England Technical Institute. While going to school, he continued to work part-time in landscaping. Within a year, he had graduated from the program and become certified as an auto mechanic. He also stopped using marijuana because he realized, after a drug test at an intern placement while still in school, that continuing to use marijuana would ruin his chances of getting or keeping a job in his new occupational field.
After the plaintiff graduated in 1999 from New England Tech, he obtained a job as a mechanic at a Copeland Service Center in Cheshire. Although he changed employers twice during the pendency of this case, by the end of evidence he was back working at Copeland. This demonstration of his ability to obtain a position as a mechanic at three different employers so soon after earning his degree and obtaining his certification as a mechanic — to leave Copeland, work at two other places, and then return to Copeland in a relatively short period of time — shows job-place demand for workers with his vocational training and skills that augurs well for his future employability and income prospects. It is likely that his income as a certified auto mechanic will increase over time, particularly since some employers of mechanics pay on a flat rate basis, where the pay for a particular job is based on the assumption that the job will take a specific amount of time and if the mechanic does it in less time, the mechanic is still paid the flat fate but can move on to another job. A flat rate pay system, if there is lots of work to be done, can thus be much more profitable than a simple hourly wage.
Without more education or vocational training, on the other hand, the defendant has limited prospects for increasing her income so that she can meet her family's needs. As a vocation, school bus driving does not offer a lucrative financial future. Her health problems limit the work she can do. The job for which she is trained and has experience, a certified nurse's aid, she can no longer do. Thus, to meet her financial needs, she must enhance her vocational skills and thereby improve her employment and income prospects. On her own, however, the defendant will not be able to CT Page 13462 afford to go back to nursing school to get an LPN degree. The LPN course at New England Tech, for example, is a full-time program for one year costing $13,000 in tuition. Even though government loans may be available to cover the cost of her tuition, she would not have enough money to pay living expenses for herself and her son, even if receiving child support based on the guidelines. New England Tech does not offer a part-time LPN program, and, given the time that child rearing will entail, it is not realistic to think that the defendant could attend school, raise her child, and also work.
After plaintiffs graduation from New England Tech in 1999 and his obtaining the new job, the parties continued to have marital problems. They went into counseling and took a family trip to Florida, both in efforts to patch the relationship, but to no avail. On the facts of this case, the court finds that the primary cause for the breakdown in the marriage was the defendant's drug use and his decision to pay more attention to his friends than to his wife. This conduct on his part led to numerous fights between the couple, and eventually, after he had benefitted from the couple's agreement that they could each return to school and obtain marketable vocational skills, the plaintiff was no longer willing to stay married.
By September 2000 the parties had $2,000 in a joint account to which both parties had contributed funds remaining from their weekly paychecks after paying household bills; the defendant also had an additional $1,600 in a checking account in her own name. At the request of the plaintiff, the defendant transferred the funds in her account to the joint account to cover possible repair expenses for the truck he drove. In October 2000, the plaintiff moved out of the marital residence and removed $1,148 from the joint account; he filed for divorce two months later. In April 2000, he paid off the loan balance of $2,300 that had been owing on the defendant's Buick.
Property: The parties have little personal property to distribute, the plaintiffs financial affidavit listing personal property worth $500 and a bank account with less than $100 and the defendant's affidavit listing personalty valued at $1,000 and a bank account of $101. The court finds these valuations to be credible. As for debts, the plaintiff has debts for his student loan, as well as owing sums to Snap-on Tools, Circuit City, and Visa, all debts that he listed on his financial affidavit and acknowledged responsibility for repaying in his testimony at trial. At trial he testified that he owes a debt incurred in April 2000 in the amount of $5,000 to a credit union that he has been paying off since then at the rate of $150.40 per month. He also owes $3,200 to MBNA, a debt he testified at trial that he believed the parties should share because it had gone to marital expenses such as the Florida trip, rent, and other CT Page 13463 family bills. The defendant owes debt of $2,000 to Visa and First Consumers that she incurred to meet expenses after the parties separated and $800 to Fashion Bug; she testified at trial she was not asking the plaintiff to assume responsibility for any of these bills. She also owes medical expenses of $1,350 and $1,500 to the credit union for her attorney's bill; at trial she testified that she wanted some contribution by the plaintiff toward that latter amount.
After considering the various factors set forth by General Statutes § 46b-81 (c), the court makes the following orders as to assignment of property and liabilities, in addition to the court's previous assignment of title to the parties' motor vehicles:
 • Each party may retain the personal property and bank accounts listed on their respective financial affidavits.
 • The plaintiff will assume responsibility for all the debts listed on his financial affidavit as well as the credit union debt not listed there but which he incurred in April. 2000.
 • The defendant will assume responsibility for all the debts listed on her affidavit.
 • Both parties will hold each other harmless for any debts or liabilities which the court assigns to them here but are the legal responsibility, in full or part, of the other.
 Alimony: The next financial question the court must confront is whether to award alimony to either party, and if so the amount and duration. After taking into consideration all of the statutory factors set forth in § 46b-82[4] governing awards of alimony, the court finds that an award of alimony to the plaintiff is not warranted but is to the defendant. Although this is but a five-year marriage, the court, after considering all the statutory factors, orders the plaintiff to pay alimony in the amount of $75 per week for a period of three years to the defendant. Such an award of alimony is intended to provide the financial resources for the defendant to be able to improve her occupational skills and enhance her employability and income prospects so that she can better meet her needs and those of her child. The amount and duration of that award are not to be modifiable except as may be permitted under §46b-86 (b).[5]
 Child Support: At present, the plaintiff is employed at Copeland CT Page 13464 Service Center as a certified mechanic earning $560 gross each week. His net income for a regular work week,[6] after all allowable deductions, including the periodic alimony ordered here,[7] will be $365. The defendant has a high school education and a class B motor vehicle license. Because she can no longer work as a CNA, she works as a school bus driver. She earns $359 gross and $303 net each week during the school year; when school is not in session, her net income, derived from unemployment compensation, part-time bus driving taking children to summer camp, or a combination, is $191 per week. Based on the seasonal nature of that work, her obligations as custodian of the child, and other relevant factors, the court finds that she currently has an average net weekly earning capacity of $280. With alimony awarded herein, her net weekly income capacity is $355.
Together, their combined net weekly incomes total $720; the plaintiffs share of that is 50.69%, and the defendant's is 49.31%. The basic child support obligation for one child under the child support guidelines, based on this combined net weekly income, is $170 per week; based on each parent's percentage share of the net weekly income, the plaintiffs presumptive current support amount would be $86.17 per week, and the defendant's $83.88 per week.
The parties have agreed, however, that their son should attend St. Stanislaus, a private parochial school, until Joshua finishes the eighth grade. They have also agreed to share the cost of that education equally, in addition to any child support otherwise ordered. The court finds it would thus be inappropriate here to award child support in the presumptive amount,[8] because in order for Joshua to attend St. Stanislaus the defendant will incur substantial and continuing extraordinary educational expenses that warrant a deviation from the presumptive support amount.[9] The court thus adds to the presumptive amount an additional $28 per week to cover one-half of the cost of tuition and uniforms for St. Stanislaus. The court accordingly orders current weekly child support in the amount of $114 per week. After payment of child support, plaintiffs net disposable income will thus be $251, and defendant's will be $469. Plaintiffs share of combined net disposable income will be 34.86% and defendant's 65.14%; the plaintiff is ordered to pay that percentage amount toward all unreimbursed medical expenses for Joshua exceeding $100 per year.
Health insurance for the minor child: Under General Statutes § 46b-84
(f), the court dissolving a marriage must include provisions in the support order for health insurance coverage for any minor children.[10]
The evidence established that Copeland Service Center does not offer health insurance benefits. The cost for dependent coverage at defendant's employer is not, based on her income, a reasonable expense for her to CT Page 13465 incur. The defendant has already applied for and obtained health insurance coverage for the minor child under the HUSKY Plan, Part B. The court orders the defendant to maintain that coverage for Joshua until he is covered by comparable other health insurance available from either parent's employer.
Attorney's Fees: The plaintiff also seeks an award of counsel fees. Under General Statutes § 46b-62, the court may order either spouse to pay the reasonable attorney's fees of the other party "in accordance with their respective financial abilities and the factors set forth in §46b-82."[11] In deciding whether to award counsel fees, the court must, in considering the statutory factors, take into account the relative financial situations of the parties. After the court's financial orders above, the plaintiff will no longer be in a superior financial position to that of the plaintiff. After considering the parties' respective financial abilities to pay, as well as the statutory factors of § 46b-82, the court thus concludes that an award of attorneys' fees is not appropriate.
Other: The defendant at trial also requested orders that the plaintiff maintain life insurance for the minor child; as there was no evidence offered as to insurability of the defendant or the availability or cost of life insurance, the court cannot do so. Michel v. Michel,31 Conn. App. 338, 624 A.2d 914 (1993). The defendant also asked for an order that the plaintiff pay alleged past-due support for the time between the plaintiffs leaving the marital home and the court's pendente lite orders; the court rejects this request as the evidence established that the defendant made payments to her during this period.
SO ORDERED.
BY THE COURT
STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT